**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NECHAMA GROSS, Derivatively on Behalf of KYNDRYL, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>MARTIN J. SCHROETER, STEPHEN A.M. HESTER, DOMINIC J. CARUSO, JOHN D. HARRIS II, SHIRLEY ANN JACKSON, JANINA KUGEL, DENIS MACHUEL, RAHUL N. MERCHANT, JANA SCHREUDER, HOWARD I. UNGERLEIDER, DAVID B. WYSHNER, and VINEET KHURANA<br><br>Defendants,<br><br>and<br><br>KYNDRYL HOLDINGS, INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff Nechama Gross, by her undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Kyndryl Holdings, Inc. ("Kyndryl" or the "Company"), against the members of the Company's Board of Directors (the "Board"), its former Chief Financial Officer ("CFO"), and former Corporate Controller for their violations of the federal securities laws, breaches of fiduciary duties, and other misconduct that resulted in material damage to the Company and its stockholders. These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the

Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, a review of the securities fraud class action complaint filed against the Company and certain of its current and former officers, transcripts of Kyndryl conference calls with financial analysts and investors, news reports, financial analyst reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. Kyndryl is a technology services company that provides infrastructure design, implementation, and managed services to help large enterprises modernize and operate their critical information technology systems. The Company was formed in 2021 when IBM spun off its managed infrastructure services business into a separate, publicly traded company. The Individual Defendants had specific duties to oversee the Company's internal controls and disclosure controls and procedures and ensure that these controls were adequate. However, the Individual Defendants failed to implement and monitor reasonable and appropriate internal controls over financial reporting and disclosure resulting in inadequate controls and the disclosure of false and misleading statements regarding the effectiveness of the Company's controls over financial reporting and the disclosure of false and misleading financial information.

2. In February 2026, the consequences of the Individual Defendants' failure to implement and monitor adequate internal controls and disclosure controls became apparent when Kyndryl was forced to disclose that it could not timely file its Quarterly Report on Form 10-Q for the quarter ended December 31, 2025 and that the SEC had opened an investigation into the Company's financial reporting. In a late-filing notice submitted on February 9, 2026, Kyndryl

revealed that its Audit Committee was reviewing the Company's cash management practices, related disclosures (including with respect to the drivers of its adjusted free cash flow metric), the effectiveness of its internal control over financial reporting, and other matters in response to voluntary document requests from the SEC's Division of Enforcement.

3. That same notice and related disclosures also made clear that Kyndryl anticipated reporting material weaknesses in internal control over financial reporting for multiple reporting periods, including the full fiscal year ended March 31, 2025 and the first two fiscal quarters of fiscal year 2026, "including with respect to controls related to information and communication and tone at the top," and warned that the Company's assessment of internal control over financial reporting and the related audit opinion in its Form 10-K for the fiscal year ended March 31, 2025 ***should no longer be relied upon.*** On the same day, Kyndryl announced the sudden departure of Defendant David B. Wyshner ("Wyshner") as CFO and the Company's General Counsel, as well as the reassignment of Defendant Vineet Khurana ("Khurana") from his role as Senior Vice President and Global Controller. Following these disclosures regarding the true state of the Company's internal controls over financial reporting and the sudden departure of these senior officers, Kyndryl's stock price fell by approximately 55% and a securities class action lawsuit was filed against the Company and Defendants Wyshner, Khurana, and Kyndryl's Chief Executive Officer ("CEO") Martin J. Schroeter ("Schroeter") in this Court. As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself and its officers.

4. As a result of the Individual Defendants' breaches of fiduciary duty and other misconduct, Kyndryl has incurred significant damages, including irreparable harm to its reputation.

5. The Individual Defendants' violations of the federal securities laws, including their securing the re-election of certain directors through a false and misleading proxy statement, have likewise caused material damage to the Company. Through this action, Plaintiff seeks to recover for the Company its damages and remediate the internal control failures that resulted in material injury to Kyndryl.

6. Plaintiff did not make a demand prior to bringing this action because it would be futile. The Company's directors are neither disinterested nor independent. In the absence of this action, Kyndryl will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II. JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b), 14(a), and 20(a), of the Exchange Act of 1934 ("the Exchange Act"), and SEC Rules 10b-5 and 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and for contribution pursuant to Section 21D of the Exchange Act. This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

8. This Court has personal jurisdiction over each of the Individual Defendants because each Defendant has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because a substantial part of the acts and omissions giving rise to the violations complained of herein occurred in this District. In addition, the related

securities fraud class action, *Brander v. Kyndryl, Inc., et al.*, No. 1:26-cv-00782-CHK, is pending in this District.

## III. PARTIES

### A. Plaintiff

10. Plaintiff Nechama Gross acquired Kyndryl stock on or about November 3, 2021 in connection with its spin-off from IBM and has held Kyndryl common stock continuously since that time. As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

### B. Defendants

#### 1. Nominal Defendant Kyndryl, Inc.

11. Nominal defendant Kyndryl is a company duly incorporated under the laws of the State of Delaware with its principal executive offices at One Vanderbilt Avenue, 15th Floor, New York, NY 10017. Kyndryl's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "KD."

#### 2. Individual Defendants

**Director Defendants**

12. Defendant Schroeter is Chairman and CEO Of Kyndryl. Schroeter was named the inaugural CEO of Kyndryl in January 2021 and Chairman in November 2021. Before joining Kyndryl, Schroeter had recently retired from IBM where he served as IBM's Senior Vice President, Global Markets, responsible for IBM's global sales, customer relationships and satisfaction and worldwide geographic operations. Schroeter was IBM's Chief Financial Officer and previously led IBM Global Financing, where he managed a total asset base of $37 billion. Schroeter also held several leadership roles in Japan, the United States and Australia.

13. Since 2025, Schroeter has received the following compensation:

| YEAR | SALARY | STOCK AWARDS | NON-EQUITY INCENTIVE PLAN COMPENSATION | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|---|
| 2025 | $1,175,000 | $11,500,025 | $2,782,562 | $346,139 | $15,803,726 |
| 2024 | $1,075,000 | $10,500,025 | $3,483,442 | $602,814 | $15,661,281 |
| 2023 | $1,000,000 | $10,500,025 | $2,000,000 | $155,321 | $13,655,346 |

14. Defendant Stephen A.M. Hester ("Hester") is the Company's Lead Director and has been a Kyndryl director since 2021. He is Chair of the Company's Nominating and Governance Committee. Since 2025, Hester received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $207,500 | $210,015 | $417,515 |

15. Defendant Dominic J. Caruso ("Caruso") is a Kyndryl director since 2021 and is Chair of the Company's Audit Committee. Since 2025, Caruso received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $155,000 | $210,015 | $365,015 |

16. Defendant John D. Harris II ("Harris") is a Kyndryl director since 2021 and a member of the Company's Nominating and Governance Committee. Since 2025, Harris has received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $125,000 | $210,015 | $335,015 |

17. Defendant Shirley Ann Jackson ("Jackson") is a Kyndryl director since 2021 and a member of the Company's Nominating and Governance Committee. Since 2025, Jackson has received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $125,000 | $210,015 | $335,015 |

18. Defendant Janina Kugel ("Kugel") is a Kyndryl director since 2021 and a member of the Company's Compensation and Human Capital Committee. Since 2025, Kugel has received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $125,000 | $210,015 | $335,015 |

19. Defendant Denis Machuel ("Machuel") is a Kyndryl director since 2021 and a member of the Company's Audit Committee. Since 2025, Machuel received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $125,000 | $210,015 | $335,015 |

20. Defendant Rahul N. Merchant ("Merchant") is a Kyndryl director since 2021 and a member of the Audit Committee. Since 2025, Merchant received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $125,000 | $210,015 | $335,015 |

21. Defendant Jana Schreuder ("Schreuder") is a Kyndryl director since 2021 and Chair of the Company's Compensation and Human Capital Committee. Since 2025, Schreuder received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $147,500 | $210,015 | $357,515 |

22. Defendant Howard I. Ungerleider ("Ungerleider") is a Kyndryl director since 2021 and a member of the Company's Compensation and Human Capital Committee. Since 2025, Ungerleider received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $125,000 | $210,015 | $335,015 |

**Officer Defendants**

23. Defendant Wyshner served as the Company's Chief Financial Officer ("CFO") from September 2021 to February 2026, when he stepped down from this position, upon information and belief, due to the misconduct alleged herein. Since 2023, Kyndryl paid Wyshner the following compensation:

| YEAR | SALARY | STOCK AWARDS | NON-EQUITY INCENTIVE PLAN COMPENSATION | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|---|
| 2025 | $855,938 | $4,000,076 | $1,266,829 | $25,350 | $6,148,193 |
| 2024 | $813,750 | $4,000,037 | $1,647,968 | $20,802 | $6,482,557 |
| 2023 | $780,000 | $4,000,027 | $975,000 | $13,389 | $5,768,416 |

24. Defendant Khurana is the Company's Senior Vice President, Business Operations. Khurana was previously Kyndryl's Corporate Controller until February 2026 when he stepped down from this position, upon information and belief, due to the misconduct alleged herein.

25. Defendants Schroeter, Hester, Caruso, Harris, Jackson, Kugel, Machuel, Merchant, Schreuder, Ungerleider, Wyshner, and Khurana are referred to as the "Individual Defendants."

26. Defendant Khurana, who sold Kyndryl shares during the Class Period while in possession of material non-public information, is referred to herein as the "Insider Seller Defendant."

## IV. THE INDIVIDUAL DEFENDANTS' DUTIES

27. By reason of their positions as officers or directors of Kyndryl and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe to Kyndryl and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Kyndryl in a fair, just, honest, and equitable manner. The Individual Defendants were and

are required to act in furtherance of the best interests of Kyndryl and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

28. The Individual Defendants, because of their positions of control and authority as directors and officers of Kyndryl, were able to and did, directly and indirectly, exercise control over the wrongful acts complained of herein.

29. As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the New York Stock Exchange, the Individual Defendants also owed a duty to ensure the reporting of accurate, complete, and truthful information concerning Kyndryl's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Kyndryl's management, policies, and internal controls.

30. At all times relevant hereto, the Individual Defendants were the agents of each other and Kyndryl and were always acting within the course and scope of such agency.

31. The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Kyndryl.

**A. Duties Under Kyndryl's Code Of Conduct**

32. In a forward introducing Kyndryl's Code of Conduct, Defendant Schroeter notes that we "earn the right to serve our customers every day by adhering to the highest level of ethical standards and delivering on our commitments" and that there are "no shortcuts when it comes to acting with trust, transparency, and integrity."

33. The Code of Conduct emphasizes the need to act with the following standards and expectations:

- Act ethically, honestly, and with integrity in everything we do on behalf of Kyndryl.
- Understand and comply with the Code, Kyndryl Policies, and all laws and regulations applicable to our business and specific to your role at Kyndryl.
- Promptly complete all required compliance training when requested.
- Seek help and guidance before taking action when we are unsure of the right thing to do.
- Promptly speak up if something doesn't feel right or we suspect a potential violation of the Code, Kyndryl Policies, or the law.

34. The Code of Conduct sets forth a duty to report all concerns of misconduct:

> Kyndryls act with trust, transparency, and integrity at all times, and our shared success and reputation depends upon it. We are all in this together and each of us has an ongoing responsibility to help protect the organization from harm and reputational damage. Speaking up when something doesn't feel right or when we suspect potential wrongdoing is not only required and expected under the Code, but is always the right thing to do.

35. The Code of Conduct imposes a duty to be honest and "never make misleading or dishonest statements to anyone, and never engage in activities that could be considered unethical, fraudulent, or otherwise unlawful." It also requires the honest, accurate and complete recording and reporting of all business information:

> Kyndryls regularly provide, to Kyndryl and others, information and data, such as requests for reimbursement of business expenses, hours worked on customer projects, or certifications. We rely on Kyndryls to record and report honest, accurate, and complete information. Under various laws, Kyndryl is required to maintain accurate books and records. Misrepresentation can lead to civil and criminal penalties for both you and Kyndryl, and the loss of business privileges, such as the right to bid on business, export or import products, or even remain in business.

> Record and report only accurate, complete, and honest information. Never report information in a way that is intended to mislead or misinform those who receive it. If you are unsure about the accuracy or completeness of any information, don't guess. Ask your manager for help. If someone directs to provide false or misleading information, report it through the **Reporting Concerns portal or hotline**.

36. The Code of Conduct emphasizes the need to understand financial controls and reporting and accurately report all financial information:

> As a public company, Kyndryl must follow strict accounting principles and standards, report financial information accurately and completely, and have appropriate internal controls and processes to ensure that our accounting and financial reporting complies with law. In other words, we must provide full, fair, accurate, timely, and understandable disclosure in reports that Kyndryl files with, or submits to, the Securities and Exchange Commission and in other public communications made by Kyndryl. Violating accounting and financial reporting laws can result in significant fines, penalties, and imprisonment. The rules for accounting and financial reporting require the proper recording of, and accounting for, revenues, costs, expenses, assets, liabilities, and cash flows. If you have responsibility or involvement in these areas, you must understand and follow these rules. These rules also prohibit you from assisting others to record or report any information inaccurately or make false or misleading financial reports.

37. The Code of Conduct requires that all employees, officers and directors compete ethically:

> Kyndryl sells its solutions and services on their merits. You should compete vigorously for business, but always ethically and in compliance with our policies and the law, no matter how competitive the environment. Never make false or misleading statements about Kyndryl and its solutions and services or other companies, including competitors and their products and services. Always be accurate, complete, and honest. Be sure all comparisons to competitors are substantiated. In certain countries, comparative advertising is prohibited or limited.

**B. Additional Duties of Audit Committee Members**

38. The Audit Committee Charter sets forth additional duties for members of the Audit Committee and provides that members are obligated to assist the Board in its oversight of, among other things, Company's risk management practices and policies; the integrity of the Company's

financial statements; the Company's compliance with legal and regulatory requirements; and the effectiveness and performance of the Company's internal audit function.

39. The Audit Committee has additional powers and obligations, including:

- Discussing with senior financial management and with the independent accountant, significant assumptions, estimates, and judgments used in the preparation of the consolidated financial statements.

- Meeting to review and discuss with management and the independent accountant the Company's quarterly financial statements to be included in the Company's Quarterly Reports on Form 10-Q, including the specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), prior to their filing with the SEC. Review the audited financial statements to be included in the Company's Annual Reports on Form 10-K, including the MD&A, prior to their filing with the SEC. Recommend to the Board of Directors that the audited financial statements be included in the Company's Annual Reports on Form 10-K. As part of this review, discuss with senior financial management and the independent accountant the accounting principles as applied. Periodically, discuss with management their approach to earnings press releases and the type of financial information and earnings guidance provided to analysts and rating agencies. Review earnings press releases and financial results in advance of release as deemed appropriate by the Committee.

- Reviewing any significant changes in accounting principles or developments in accounting practices and the effects of these changes upon the Company's financial reporting.

- Reviewing with the independent accountant any audit problems or difficulties and management's response.

- Conducting regular private review sessions with the independent accountant as deemed appropriate by the Committee.

- Assessing the effectiveness of the internal audit effort through regular meetings conducted separately with the independent accountant and internal auditor. Reviewing the performance of the Company's General Auditor. Conducting regular private review sessions with the General Auditor as deemed appropriate by the Committee.

- Reviewing with the internal auditor the adequacy of the system of internal controls and the responsiveness of management in correcting audit related deficiencies. Discuss policies regarding risk assessment and risk management.

- Overseeing the compliance function and the Company's compliance with legal and regulatory requirements and corporate policy.

- Reviewing the implementation of the Kyndryl Code of Conduct process to monitor compliance with the Code through education and employee certification.

- Periodically reviewing the Company's enterprise risk management framework, including the Company's enterprise risk management processes.

- Receiving and discussing reports from management on an annual or as needed basis as deemed appropriate by the Committee relating to, *inter alia,* financial and internal controls, investigations; the Company's use of financial instruments; litigation and regulatory risks; and key controls and processes in specific business or functional areas.

## V. SUBSTANTIVE ALLEGATIONS

### A. Background

40. Kyndryl is a global information technology infrastructure services company that was created through the spin-off of IBM's managed infrastructure services business. It began operating as an independent, publicly traded company in November 2021, when IBM completed the separation and Kyndryl's shares started trading on the New York Stock Exchange under the ticker symbol "KD."

41. Kyndryl's business centers on designing, building, and managing complex, mission-critical information systems for large enterprise and public-sector customers across more than 60 countries. These systems include data centers, networks, mainframes, and hybrid cloud environments that support core operations for industries such as financial services, telecommunications, manufacturing, government, and healthcare.

42. Kyndryl's service offerings reflect the legacy IBM infrastructure business but have been rebranded and reorganized to emphasize modernization. Key focus areas include cloud services (such as cloud migration, hybrid cloud management, and multicloud orchestration), data and AI (including analytics and AI operations), cybersecurity (identity and access management, threat detection, and resilience), network and edge computing, and digital workplace services. The company also offers proprietary platforms and tools—such as Kyndryl Bridge—to provide integrated management, observability, and automation across customers' IT environments.

43. Strategically, the spin-off was intended to allow Kyndryl to pursue partnerships and technology stacks beyond IBM's own software and cloud platforms. As an independent company, Kyndryl has entered into alliances with multiple hyperscale cloud providers and technology vendors, positioning itself as a vendor-agnostic infrastructure specialist. Its business model is largely contract-based, with long-term engagements to operate and transform clients' infrastructure while helping them modernize legacy systems, adopt cloud and AI technologies, and improve reliability, security, and efficiency in their IT operations.

### B. The Individual Defendants Misrepresent The State Of Kyndryl's Internal Controls Over Financial Reporting And Allow The Issuance Of False Financial Information

44. On August 7, 2024, Kyndryl filed with the SEC a Quarterly Report on Form 10-Q for the period ended June 30, 2024 (the "1Q25 10-Q"). Attached to the 1Q25 10-Q were certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX"), signed by Defendant Schroeter and Defendant Wyshner, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. Defendant Khurana signed the 1Q25 10-Q as the Company's authorized signatory pursuant to the requirements of the Exchange Act.

45. In discussing disclosure controls, the 1Q25 10-Q described an evaluation conducted by management with the participation of Defendant Schroeter and Defendant Wyshner, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by the 10-Q which concluded that the Company's disclosure controls and procedures were not effective due to a material weakness in internal control over financial reporting in the area of information technology general controls ("ITGCs") (that was disclosed in Part II, Item 9A of the Company's Form 10-K).

46. The 1Q25 10-Q also represented:

> There have been no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting ***other than the ongoing remediation of the ITGC deficiencies described below.***[1]

47. In reality, the Company downplayed the severity and scope of its internal control failures by describing only ITGC deficiencies and omitting other material weaknesses affecting the Company's internal control over financial reporting.

[1] All emphasis herein is added unless otherwise noted.

48. The 1Q25 10-Q contained a consolidated statement of cash flows which materially misrepresented the Company's financial condition:

KYNDRYL HOLDINGS, INC.
CONSOLIDATED STATEMENT OF CASH FLOWS
(Dollars in millions)
(Unaudited)

| | Three Months Ended June 30, | |
|---|---|---|
| | 2024 | 2023 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ 11 | $ (141) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 127 | 210 |
| Depreciation of right-of-use assets | 70 | 91 |
| Amortization of transition costs and prepaid software | 310 | 325 |
| Amortization of capitalized contract costs | 107 | 138 |
| Amortization of acquisition-related intangible assets | 7 | 8 |
| Stock-based compensation | 24 | 22 |
| Deferred taxes | 17 | 26 |
| Net (gain) loss on asset sales and other | 27 | 29 |
| Change in operating assets and liabilities: | | |
| Deferred costs (excluding amortization) | (363) | (418) |
| Right-of-use assets and liabilities (excluding depreciation) | (65) | (103) |
| Workforce rebalancing liabilities | 7 | (23) |
| Receivables | 163 | 53 |
| Accounts payable | (122) | (143) |
| Taxes | (9) | (25) |
| Other assets and other liabilities | (358) | (222) |
| **Net cash provided by (used in) operating activities** | $ (48) | $ (173) |
| **Cash flows from investing activities:** | | |
| Capital expenditures | $ (122) | $ (100) |
| Proceeds from disposition of property and equipment | 24 | 6 |
| Acquisitions and divestitures, net of cash acquired | (46) | — |
| Other investing activities, net | (22) | (19) |
| **Net cash used in investing activities** | $ (166) | $ (113) |
| **Cash flows from financing activities:** | | |
| Debt repayments | $ (38) | $ (30) |
| Common stock repurchases for tax withholdings | (7) | (7) |
| Other financing activities, net | (6) | (1) |
| **Net cash provided by (used in) financing activities** | $ (51) | $ (38) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ (17) | $ (15) |
| Net change in cash, cash equivalents and restricted cash | $ (281) | $ (339) |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,554 | $ 1,860 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,273 | $ 1,521 |
| **Supplemental data** | | |
| Income taxes paid, net of refunds received | $ 54 | $ 65 |
| Interest paid on debt | $ 40 | $ 46 |

The accompanying notes are an integral part of the financial statements.

49. On November 7, 2024, Kyndryl filed with the SEC a Quarterly Report on Form 10-Q for the period ended September 30, 2024 (the "2Q25 10-Q"). As before, Defendants Schroeter and Wyshner signed SOX certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to internal control over financial reporting, and the disclosure of all fraud. Defendant Khurana again signed the 2Q25 10-Q.

50. The 2Q25 10-Q represented that based on an evaluation by management with the participation of Defendants Schroeter and Wyshner, the Company's disclosure controls and procedures were not effective due to a material weakness in internal controls over financial reporting in the area of ITGCS and that these deficiencies were "related to access and program development and change management controls associated with the Company's large-scale migration in a compressed timeframe of its internal operating systems to a new enterprise resource planning system, which was required to replace the systems temporarily being made available to

the Company by our former Parent following our Spin-off." However, Defendants Schroeter and Wyshner and Khurana represented in the 2Q25 10-Q that these "T control deficiencies did not result in a misstatement to the annual or interim consolidated financial statements previously filed or included in this Form 10-Q."

51. The 2Q25 10-Q further represented:

> There have been no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the quarter ended September 30, 2024 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting other than the ongoing remediation of the ITGC deficiencies described below.

52. The 2Q25 10-Q contained the following misstated consolidated cash flows statement:

KYNDRYL HOLDINGS, INC.
CONSOLIDATED STATEMENT OF CASH FLOWS
(Dollars in millions)
(Unaudited)

| | Six Months Ended September 30, | | | |
|---|---|---|---|---|
| | | 2024 | | 2023 |
| **Cash flows from operating activities:** | | | | |
| Net income (loss) | $ | (32) | $ | (283) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | | | |
| Depreciation and amortization: | | | | |
| Depreciation of property, equipment and capitalized software | | 276 | | 431 |
| Depreciation of right-of-use assets | | 154 | | 173 |
| Amortization of transition costs and prepaid software | | 647 | | 631 |
| Amortization of capitalized contract costs | | 205 | | 281 |
| Amortization of acquisition-related intangible assets | | 17 | | 15 |
| Stock-based compensation | | 49 | | 48 |
| Deferred taxes | | 17 | | 51 |
| Net (gain) loss on asset sales and other | | (14) | | 22 |
| Change in operating assets and liabilities: | | | | |
| Deferred costs (excluding amortization) | | (852) | | (699) |
| Right-of-use assets and liabilities (excluding depreciation) | | (145) | | (195) |
| Workforce rebalancing liabilities | | (13) | | (18) |
| Receivables | | 193 | | (110) |
| Accounts payable | | (237) | | (494) |
| Taxes | | (31) | | (55) |
| Other assets and other liabilities | | (133) | | 75 |
| **Net cash provided by (used in) operating activities** | $ | 101 | $ | (127) |
| **Cash flows from investing activities:** | | | | |
| Capital expenditures | $ | (256) | $ | (275) |
| Proceeds from disposition of property and equipment | | 54 | | 119 |
| Acquisitions and divestitures, net of cash acquired | | (46) | | — |
| Other investing activities, net | | 7 | | (53) |
| **Net cash used in investing activities** | $ | (241) | $ | (208) |
| **Cash flows from financing activities:** | | | | |
| Debt repayments | $ | (73) | $ | (67) |
| Common stock repurchases for tax withholdings | | (24) | | (12) |
| Other financing activities, net | | (5) | | (1) |
| **Net cash provided by (used in) financing activities** | $ | (101) | $ | (80) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ | 17 | $ | (33) |
| Net change in cash, cash equivalents and restricted cash | $ | (224) | $ | (448) |
| Cash, cash equivalents and restricted cash at beginning of period | $ | 1,554 | $ | 1,860 |
| **Cash, cash equivalents and restricted cash at end of period** | $ | 1,330 | $ | 1,412 |
| **Supplemental data** | | | | |
| Income taxes paid, net of refunds received | $ | 89 | $ | 88 |
| Interest paid on debt | $ | 60 | $ | 59 |

The accompanying notes are an integral part of the financial statements.

53. On February 6, 2025, Kyndryl filed with the SEC a Quarterly Report on Form 10-Q for the period ended December 31, 2024 (the "3Q25 10-Q"). Defendant Schroeter and Defendant Wyshner again signed SOX certifications attesting to the accuracy of financial reporting, the

disclosure of any material changes to internal control over financial reporting, and the disclosure of all fraud. Defendant Khurana signed the 3Q25 10-Q as the Company's authorized signatory.

54. The 3Q25 10-Q represented that, based on an evaluation by management with the participation of Defendant Schroeter and Defendant Wyshner, the Company's disclosure controls and procedures were not effective as of the end of the period covered by this report due to a material weakness in internal control over financial reporting in the area of ITGCs that was disclosed in Part II, Item 9A of the Company's Form 10-K. It again stated that the ITGC deficiencies were related to access and program development and change management controls associated with the Company's large-scale migration in a compressed timeframe of its internal operating systems to a new enterprise resource planning system following the spin-off. The 3Q25 10-Q also stated that these control deficiencies "did not result in a misstatement to the annual or interim consolidated financial statements previously filed or included in this Form 10-Q."

55. The 3Q25 10-Q further represented that there were no changes in the Company's internal control over financial reporting (as that term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the quarter ended December 31, 2024 that had materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting, other than the ongoing remediation of the ITGC deficiencies described in the report.

56. The 3Q25 10-Q contained the following false and misleading consolidated cash flows statement:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
(Dollars in millions)
(Unaudited)

| | Nine Months Ended December 31, 2024 | Nine Months Ended December 31, 2023 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ 183 | $ (295) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 471 | 639 |
| Depreciation of right-of-use assets | 220 | 251 |
| Amortization of transition costs and prepaid software | 974 | 946 |
| Amortization of capitalized contract costs | 314 | 418 |
| Amortization of acquisition-related intangible assets | 23 | 23 |
| Stock-based compensation | 78 | 72 |
| Deferred taxes | 22 | 55 |
| Net (gain) loss on asset sales and other | (108) | (6) |
| Change in operating assets and liabilities: | | |
| Deferred costs (excluding amortization) | (1,273) | (1,023) |
| Right-of-use assets and liabilities (excluding depreciation) | (212) | (269) |
| Workforce rebalancing liabilities | (22) | (28) |
| Receivables | 177 | (13) |
| Accounts payable | (265) | (339) |
| Taxes | (39) | (33) |
| Other assets and other liabilities | (183) | (90) |
| **Net cash provided by operating activities** | $ 361 | $ 309 |
| **Cash flows from investing activities:** | | |
| Capital expenditures | $ (365) | $ (449) |
| Proceeds from disposition of property and equipment | 70 | 134 |
| Acquisitions and divestitures, net of cash acquired | 137 | — |
| Other investing activities, net | (42) | (35) |
| **Net cash used in investing activities** | $ (199) | $ (350) |
| **Cash flows from financing activities:** | | |
| Debt repayments | $ (108) | $ (103) |
| Common stock repurchases | (30) | — |
| Common stock repurchases for tax withholdings | (32) | (19) |
| Other financing activities, net | (2) | (1) |
| **Net cash used in financing activities** | $ (172) | $ (123) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ (39) | $ (5) |
| Net change in cash, cash equivalents and restricted cash | $ (49) | $ (169) |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,554 | $ 1,860 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,505 | $ 1,691 |
| **Supplemental data** | | |
| Income taxes paid, net of refunds received | $ 123 | $ 140 |
| Interest paid on debt | $ 100 | $ 108 |

The accompanying notes are an integral part of the financial statements.

57. On May 30, 2025, Kyndryl filed with the SEC its Annual Report on Form 10-K for the fiscal year ended March 31, 2025 (the "2025 Form 10-K") which was signed by Defendants the Individual Defendants. Defendant Schroeter and Defendant Wyshner signed SOX certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to internal control over financial reporting, and the disclosure of all fraud.

58. In the 2025 Form 10-K, the Individual Defendants represented that management, with the participation of Defendants Schroeter Wyshner, had evaluated the effectiveness of Kyndryl's disclosure controls and procedures as of March 31, 2025, and that Defendants Schroeter and Wyshner concluded that the Company's disclosure controls and procedures ***were effective*** as of the end of the period covered by this report. The Individual Defendants further represented that management, with the participation of Defendant Schroeter and Defendant Wyshner, evaluated the effectiveness of Kyndryl's internal control over financial reporting as of March 31, 2025 using the Committee of Sponsoring Organizations of the Treadway Commission's Internal Control –

Integrated Framework (2013) and that, based on this evaluation, management concluded that, as of March 31, 2025, Kyndryl's internal control over financial reporting was effective.

59. The Individual Defendants also represented that there have been no changes in the Company's internal control over financial reporting (as that term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the quarter ended March 31, 2025 that had materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting, other than the remediation of information technology general controls as part of previously disclosed remediation activities.

60. The 2025 10-K also included the following misstated consolidated statement of cash flows:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**(Dollars in millions)**

| | Year Ended March 31, 2025 | 2024 | 2023 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $ 252 | $ (340) | $ (1,374) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | | |
| Depreciation and amortization: | | | |
| Depreciation of property, equipment and capitalized software | 660 | 834 | 900 |
| Depreciation of right-of-use assets | 327 | 319 | 428 |
| Amortization of transition costs and prepaid software | 1,278 | 1,256 | 1,199 |
| Amortization of capitalized contract costs | 420 | 531 | 472 |
| Amortization of acquisition-related intangible assets | 30 | 30 | 46 |
| Stock-based compensation | 100 | 95 | 113 |
| Deferred taxes | (1) | (13) | 285 |
| Net (gain) loss on asset sales and other | (152) | 43 | 6 |
| Change in operating assets and liabilities: | | | |
| Deferred costs (excluding amortization) | (1,762) | (1,569) | (1,592) |
| Right-of-use assets and liabilities (excluding depreciation) | (314) | (335) | (361) |
| Workforce rebalancing liabilities | (25) | (38) | 41 |
| Receivables | 289 | 11 | 664 |
| Accounts payable | (89) | (305) | 282 |
| Taxes | (1) | (2) | 90 |
| Other assets and other liabilities | (71) | (63) | (415) |
| **Net cash provided by operating activities** | $ 942 | $ 454 | $ 781 |
| **Cash flows from investing activities:** | | | |
| Capital expenditures | $ (605) | $ (651) | $ (865) |
| Proceeds from disposition of property and equipment | 83 | 138 | 23 |
| Acquisitions and divestitures, net of cash acquired | 139 | — | — |
| Other investing activities, net | (20) | (40) | 7 |
| **Net cash used in investing activities** | $ (404) | $ (553) | $ (835) |
| **Cash flows from financing activities:** | | | |
| Debt repayments | $ (148) | $ (644) | $ (118) |
| Proceeds from issuance of debt, net of debt issuance costs | — | 494 | — |
| Common stock repurchases | (93) | — | — |
| Common stock repurchases for tax withholdings | (45) | (22) | (19) |
| Other financing activities, net | — | 2 | (4) |
| **Net cash used in financing activities** | $ (286) | $ (170) | $ (141) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ (16) | $ (37) | $ (100) |
| Net change in cash, cash equivalents and restricted cash | $ 235 | $ (306) | $ (294) |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,554 | $ 1,860 | $ 2,154 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,789 | $ 1,554 | $ 1,860 |
| **Supplemental data** | | | |
| Income taxes paid, net of refunds received | $ 149 | $ 191 | $ 167 |
| Interest paid on debt | $ 119 | $ 118 | $ 98 |

The accompanying notes are an integral part of the financial statements.

61. On August 5, 2025, Kyndryl filed with the SEC a Quarterly Report on Form 10-Q for the period ended June 30, 2025 (the "1Q26 10-Q"). Defendant Schroeter and Defendant Wyshner again signed SOX certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to internal control over financial reporting, and the disclosure of all fraud. Defendant Khurana signed the 1Q26 10-Q as the Company's authorized signatory.

62. The 1Q26 10-Q represented that management, with the participation of Defendant Schroeter and Defendant Wyshner, had evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by the report and that, based on that evaluation, Defendant Schroeter and Defendant Wyshner concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report.

63. The 1Q26 10-Q further represented that there were no changes in the Company's internal control over financial reporting (as that term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by the report that had materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

64. The 1Q26 10-Q also contained the following misstated consolidated cash flows statement:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**(Dollars in millions)**
**(Unaudited)**

| | Three Months Ended June 30, | |
|---|---|---|
| | 2025 | 2024 |
| **Cash flows from operating activities:** | | |
| Net income | $ 56 | $ 11 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 191 | 127 |
| Depreciation of right-of-use assets | 73 | 70 |
| Amortization of transition costs and prepaid software | 308 | 310 |
| Amortization of capitalized contract costs | 106 | 107 |
| Amortization of acquisition-related intangible assets | 7 | 7 |
| Stock-based compensation | 24 | 24 |
| Deferred taxes | (10) | 17 |
| Net (gain) loss on asset sales and other | — | 27 |
| Change in operating assets and liabilities: | | |
| Right-of-use assets and liabilities (excluding depreciation) | (88) | (65) |
| Workforce rebalancing liabilities | 3 | 7 |
| Receivables | 46 | 163 |
| Accounts payable | (269) | (122) |
| Taxes | 27 | (9) |
| Deferred costs (excluding amortization) | (1,381) | (363) |
| Other assets and other liabilities | 781 | (358) |
| **Net cash provided by (used in) operating activities** | $ (124) | $ (48) |
| | | |
| **Cash flows from investing activities:** | | |
| Capital expenditures | $ (143) | $ (122) |
| Proceeds from disposition of property and equipment | 45 | 24 |
| Acquisitions and divestitures, net of cash acquired | 1 | (46) |
| Other investing activities, net | 22 | (22) |
| **Net cash used in investing activities** | $ (74) | $ (166) |
| | | |
| **Cash flows from financing activities:** | | |
| Debt repayments | $ (36) | $ (38) |
| Common stock repurchases | (62) | — |
| Common stock repurchases for tax withholdings | (67) | (7) |
| Other financing activities, net | (5) | (6) |
| **Net cash used in financing activities** | $ (170) | $ (51) |
| | | |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ 46 | $ (17) |
| Net change in cash, cash equivalents and restricted cash | $ (323) | $ (281) |
| | | |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,789 | $ 1,554 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,466 | $ 1,273 |
| | | |
| **Supplemental data** | | |
| Income taxes paid, net of refunds received | $ 67 | $ 54 |
| Interest paid on debt | $ 39 | $ 40 |

The accompanying notes are an integral part of the financial statements.

65. On November 5, 2025, Kyndryl filed with the SEC a Quarterly Report on Form 10-Q for the period ended September 30, 2025 (the "2Q26 10-Q"). Defendant Schroeter and Defendant Wyshner again signed SOX certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to internal control over financial reporting, and

the disclosure of all fraud. Defendant Khurana signed the 2Q26 10-Q as the Company's authorized signatory.

66. The 2Q26 10-Q represented that management, with the participation of Defendant Schroeter and Defendant Wyshner, had evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by the report and that, based on that evaluation, Defendant Schroeter and Defendant Wyshner concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by the 2Q26 10-Q.

67. The 2Q26 10-Q further represented that there were no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

68. The 2Q26 10-Q also contained the following misstated consolidated cash flows statement:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**(Dollars in millions)**
**(Unaudited)**

| | Six Months Ended September 30, 2025 | Six Months Ended September 30, 2024 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ 124 | $ (32) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 384 | 276 |
| Depreciation of right-of-use assets | 147 | 154 |
| Amortization of transition costs and prepaid software | 613 | 647 |
| Amortization of capitalized contract costs | 231 | 205 |
| Amortization of acquisition-related intangible assets | 14 | 17 |
| Stock-based compensation | 50 | 49 |
| Deferred taxes | (17) | 17 |
| Net (gain) loss on asset sales and other | — | (14) |
| Change in operating assets and liabilities: | | |
| Right-of-use assets and liabilities (excluding depreciation) | (173) | (145) |
| Workforce rebalancing liabilities | (1) | (13) |
| Receivables | 6 | 193 |
| Accounts payable | (328) | (237) |
| Taxes | 23 | (31) |
| Deferred costs (excluding amortization) | (1,697) | (852) |
| Other assets and other liabilities | 645 | (133) |
| **Net cash provided by operating activities** | $ 22 | $ 101 |
| **Cash flows from investing activities:** | | |
| Capital expenditures | $ (272) | $ (256) |
| Proceeds from disposition of property and equipment | 51 | 54 |
| Acquisitions and divestitures, net of cash acquired | 1 | (46) |
| Other investing activities, net | 26 | 7 |
| **Net cash used in investing activities** | $ (196) | $ (241) |
| **Cash flows from financing activities:** | | |
| Debt repayments | $ (70) | $ (73) |
| Common stock repurchases | (151) | — |
| Common stock repurchases for tax withholdings | (89) | (24) |
| Other financing activities, net | (1) | (5) |
| **Net cash used in financing activities** | $ (310) | $ (101) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ 30 | $ 17 |
| Net change in cash, cash equivalents and restricted cash | $ (453) | $ (224) |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,789 | $ 1,554 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,336 | $ 1,330 |
| **Supplemental data** | | |
| Income taxes paid, net of refunds received | $ 92 | $ 89 |
| Interest paid on debt | $ 58 | $ 60 |

The accompanying notes are an integral part of the financial statements.

## C. The Company Discloses The True State Of Its Financial Condition And An SEC Investigation

69. On February 9, 2026, Kyndryl publicly acknowledged significant problems with its reporting and controls when it filed a Notification of Late Filing on Form 12b-25 with the SEC, advising that it would not be able to timely file its Quarterly Report on Form 10-Q for the quarter ended December 31, 2025. That notice further revealed that regulators were scrutinizing the Company's financial reporting, disclosing that the SEC had opened an investigation into Kyndryl's practices.

70. In the late-filing notice, Kyndryl explained that its Audit Committee had begun a broad review of the Company's cash practices, related disclosures, and internal controls after receiving document requests from the SEC's Division of Enforcement. The notice stated that Kyndryl, through the Audit Committee of its Board of Directors, was reviewing its cash management practices, related disclosures (including regarding the drivers of the Company's adjusted free cash flow metric), the efficacy of its internal control over financial reporting, and "certain other matters" following the Company's receipt of voluntary document requests from the SEC. The Company further advised that, "[d]ue to this review, the finalization of the Quarterly Report, including the Company's assessment of internal control over financial reporting, requires additional time to complete."

71. The notice went on to warn investors that Kyndryl expected to disclose significant control failures spanning multiple periods. It stated that, in connection with the eventual filing of the delayed Quarterly Report, "the Company anticipates reporting material weaknesses in the Company's internal control over financial reporting for the period covered in the Quarterly Report, as well as for the full fiscal year ended March 31, 2025, and the first two fiscal quarters of fiscal year 2026," including weaknesses in "the effectiveness and strength of certain functions at the Company, including with respect to controls related to information and communication and tone

at the top." The notice then cautioned that, as a result, the Company's assessment of internal control over financial reporting and the related opinion of PricewaterhouseCoopers LLP only with respect to the effectiveness of the Company's internal control over financial reporting as of March 31, 2025 included in the Company's Annual Report on Form 10-K for the full fiscal year ended March 31, 2025 ***should no longer be relied upon***.

### D. The Company Announces The Sudden Departure Of Defendants Wyshner and Khurana And Its Stock Price Plummets

72. On February 9, 2026, Kyndryl also announced the abrupt departures of several key executives. In a Form 8-K, the Company announced Defendant Wyshner would be resigning from his position as CFO of the Company and Edward Sebold would be leaving his position as General Counsel of the Company "effective immediately," and that Defendant Khurana had "stepped down from his position as Senior Vice President and Global Controller of the Company and assumed a different role." In another Form 8-K, the Company announced that "Harsh Chugh has been named Interim Chief Financial Officer, Mark Ringes has been named Interim General Counsel and Bhavna Doegar has been named Interim Corporate Controller effective immediately."

73. The market reacted sharply to the revelation of the delayed filing, the newly disclosed internal control weaknesses, and the sudden senior management changes. On February 9, 2026, Kyndryl's stock price declined by $12.90 per share, or 55%, to close at $10.59 per share, wiping out substantial shareholder value.

74. A Bloomberg Intelligence analyst noted that the Company's announcements signaled "mounting strain on a turnaround already under pressure" and stated: "The [C]ompany says financial statements won't change, yet governance, controls and credibility are in sharp focus, raising execution and confidence risks, especially as Kyndryl simultaneously trimmed full-year

targets." JPMorgan analysts downgraded Kyndryl shares to underweight from overweight and lowered their price targets for the stock from $40 to $16 per share. These analysts highlighted that "[t]oday's negative guidance revision and stunning CFO change delays the turnaround, creating new questions across the thesis and forcing bulls to return to the drawing board. As a result, our thesis no longer holds, prompting us to downgrade the stock."

75. On February 17, 2026, the Company filed amended reports for the year ending March 31, 2025 and for the quarters ending June 30, 2025 and September 30, 2025. In a Quarterly Report filed for the quarter ending December 31, 2025, the Company again announced that the Company had received and was responding to "voluntary document requests from the Division of Enforcement" of the SEC "relating to the Company's cash management practices, related disclosure, the efficacy of the Company's internal controls over financial reporting, and certain other matters" and that the matter was "ongoing."

**E. A Securities Class Action Is Filed Against The Company**

76. On February 11, 2026, a securities class action lawsuit was filed in the United States District Court for the Eastern District of New York against the Company, Defendants Schroeter Wyshner, and Khurana, captioned *Brander v. Kyndryl Holdings, Inc., et al.*, No. 1:26-cv-00782-CHK (E.D.N.Y.) (the "Securities Class Action"), alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC. The complaint seeks damages on behalf of a class who purchased or otherwise acquired Kyndryl shares between August 7, 2024 and February 9, 2026, inclusive. The plaintiff asserts that the named defendants issued materially false and misleading statements and omitted material facts concerning Kyndryl's internal controls and financial reporting, thereby inflating the Company's stock price and causing losses when the truth was revealed.

**F. Kyndryl's False And Misleading Proxy Statement**

77. On June 16, 2025, the Company filed its 2025 Proxy Statement with the SEC soliciting shareholder votes to, among other things, re-elect Defendants Kugel, Machuel, and Merchant to the Board and approve executive compensation. The Proxy Statement was issued by the order of the Board and signed by Defendant Schroeter.

78. The 2025 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures:

> The Board is responsible for the overall oversight of management in the execution of its responsibilities. In this oversight role, the Board regularly reviews the Company's long-term business strategy and works with management to set the short-term and long-term strategic objectives of the Company and to monitor progress on those objectives.
>
> One of the most important oversight responsibilities for our Board is with respect to risk management related to us and our business. The Board executes this oversight with a multi-tiered approach through oversight by the entire Board, as well as through its Audit Committee, Compensation and Human Capital Committee and Nominating and Governance Committee, each of which assists the Board in overseeing a part of our overall risk management and regularly reports to the Board, as discussed below. In that way, risk oversight responsibilities are shared by all committees of the Board, with each committee responsible for oversight of matters most aligned with the responsibilities set forth in its charter. We believe that allocating responsibility to a committee with relevant knowledge and experience provides a more focused and deeper oversight of risk.

79. The 2025 Proxy Statement represents that the Audit Committee is engaged in vigorous oversight over risks to the Company noting that the Committee "reviews and discusses all significant areas of our business and related risks and summarizes for the Board areas of risk . . . and any mitigating factors," with respect to compliance matters, "receives regular updates" from Kyndryl's Chief Compliance Officer, who reports to our General Counsel" and with respect to enterprise risk management, "receives regular updates" from Kyndryl's SVP & General Auditor.

80. The 2025 Proxy Statement represents that the Company is committed to "strong corporate governance" practices, "effective board leadership" and independent oversight.

81. The foregoing statements in the 2025 Proxy Statement were false and misleading and omitted material information. Contrary to the representations made in the Proxy, the Board was required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Kyndryl's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's financial reporting and disclosure controls and procedures; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

82. On August 1, 2025, Kyndryl filed with the SEC a Current Report on Form 8-K announcing, among other things, the reelection of Defendants Kugel, Machuel, and Merchant, and the approval of executive compensation, pursuant to the solicitations in the 2025 Proxy Statement.

**G. Insider Trading by the Insider Seller Defendant**

83. During the Class Period, while Kyndryl's stock price was artificially inflated by the Individual Defendants' materially false and misleading statements and omissions, Defendant Khurana sold Kyndryl shares on three occasions at prices that he knew to be artificially inflated due to his knowledge of the Company's undisclosed internal control failures and the manipulation of its adjusted free cash flow metric, thereby reaping substantial profits at the expense of the Company's public shareholders:

| Trade Date | Shares Sold | Avg. Price | Proceeds |
|---|---|---|---|
| Feb. 6, 2025 | 55,465 | $42.81 | $2,374,491 |
| Jun. 2, 2025 | 26,451 | $39.14 | $1,035,359 |
| Dec. 5, 2025 | 6,641 | $26.69 | $177,276 |

| Trade Date | Shares Sold | Avg. Price | Proceeds |
|---|---|---|---|
| **Total** | **88,557** | | **$3,587,126** |

84. Khurana's largest sale — 55,465 shares on February 6, 2025 — was executed at a price of approximately $42.81 per share while the stock traded near its class-period high, simultaneously with the filing of the 3Q25 10-Q containing additional misrepresentations about the effectiveness of the Company's internal controls. When the truth was revealed on February 9, 2026, Kyndryl's stock price collapsed by approximately 55%, closing at $10.59 per share. By selling at artificially inflated prices, Khurana enriched himself at the expense of the Company and its stockholders in the amount of at least $3,587,126.

**H. Share Repurchase Waste**

85. During the Class Period, the Board caused Kyndryl to repurchase its own common stock at prices that were artificially inflated by the Individual Defendants' materially false and misleading statements and omissions. On November 21, 2024, the Board — while aware of the true extent of the Company's internal control failures and the manipulation of its adjusted free cash flow metric — authorized a $300 million share repurchase program. In November 2025, even as the SEC investigation into the Company's financial reporting was already underway, the Board authorized an additional $400 million share repurchase program. By February 9, 2026, Kyndryl had repurchased approximately 11 million shares under these programs. Both repurchase authorizations were made at times when the Individual Defendants knew, but had failed to disclose, the true extent of the Company's internal control failures — including the material weaknesses in controls related to information and communication and "tone at the top" — and the unreliability of the adjusted free cash flow metric that the Individual Defendants had specifically cited as justification for initiating the buyback program. As a result, the Company paid artificially inflated prices for its own shares, wasting corporate assets.

## VI. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

86. Plaintiff brings this action derivatively and for the benefit of Kyndryl to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Kyndryl, gross mismanagement, and violations of Sections 10(b), as well as Rule 10b-5 promulgated thereunder by the SEC, 14(a) of the Exchange Act, 20(a) and 21D of the Exchange Act, as well as the aiding and abetting thereof.

87. Kyndryl is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

88. Plaintiff is, and has been at all relevant times, a stockholder of Kyndryl and was a stockholder of the Company at the time of the transactions alleged herein. Plaintiff will adequately and fairly represent the interests of Kyndryl in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

89. Plaintiff has not made a demand on the Director Defendants to institute this action because such demand would be futile. At the time this action was filed, the Board consisted of ten (10) directors: Defendants Schroeter, Hester, Caruso, Harris, Jackson, Kugel, Machuel, Merchant, Schreuder, and Ungerleider. As set forth below, a majority of the Board — including at least six (6) of the ten (10) members — could not have exercised disinterested business judgment in responding to a demand.

### A. Demand Upon Defendant Schroeter Is Excused

90. Defendant Schroeter is the Chairman and CEO of Kyndryl. Schroeter was named the inaugural CEO of Kyndryl in January 2021 and Chairman in November 2021. Schroeter therefore is not independent. Indeed, Kyndryl's 2025 Proxy Statement, filed with the SEC on June 16, 2025, does not list Schroeter as an independent director.

91. As an employee of Kyndryl, the Company provides Defendant Schroeter with his principal occupation from which he receives substantial compensation, including $15,661,281 and $15,803,726, in 2024 and 2025, respectively. Thus, Schroeter could not consider a demand for action that might require him to sue the directors who control his continued employment or fellow members of management with whom he works on a day-to-day basis.

92. As CEO and Chairman of Kyndryl, Schroeter was directly responsible for the materially false and misleading statements that form the basis of this action. Schroeter also signed the materially false and misleading 2025 Proxy Statement which falsely represented that the Board and the Audit Committee actively oversaw the Company's risk exposures and maintained effective corporate governance practices and faces a substantial likelihood of liability therefor.

93. Defendant Schroeter is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

94. Prior to being appointed CEO in 2021, Schroeter served in a variety of business line and finance executive positions at IBM including Senior Vice President and Chief Financial Officer from 2014 until 2017, leading IBM's shift in spending profile to align with IBM strategic initiatives, and Senior Vice President of Global Markets from 2018 until 2020, responsible for IBM's global sales, customer relationships and satisfaction and worldwide geographic operations and overseeing IBM's marketing and communication functions and building IBM's brand and reputation globally. Kyndryl has several ongoing agreements with IBM, as outlined in detail in the Company's 2025 Proxy Statement, such as a transition services agreement, a tax matters agreement, an employee matters agreement, a real estate matters agreement, and several agreements governing intellectual property, and commercial arrangements. Based on his strong

connection to IBM, Schroeter is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

95. Further, Defendants Schroeter and Khurana have a long-standing business relationship. They worked together at IBM with Schroeter serving in several executive positions at the Company since 1992 and Khurana working in finance and accounting roles within IBM's global business units for over twenty years before moving with Schroeter to Kyndryl during the IBM spin-off. Therefore, Schroeter cannot consider a demand to commence and vigorously prosecute this action against Khurana with the required independence and disinterest.

96. Schroeter, as a director of Kyndryl, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Kyndryl's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's financial reporting and disclosure controls and procedures; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

97. Schroeter is neither disinterested nor independent. Any demand upon Defendant Schroeter is futile and, thus, excused.

**B. Demand Upon Defendant Hester Is Excused**

98. Hester authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

99. Hester, as a director of Kyndryl, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Kyndryl's core operations and making truthful, accurate,

and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's financial reporting and disclosure controls and procedures; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

100. Hester, as Lead Independent Director, had heightened responsibilities under Kyndryl's Corporate Governance Guidelines to facilitate effective board governance and independent oversight of management. Hester utterly failed to perform these essential duties.

101. Hester failed to uphold his additional obligations as Chair of the Nominating and Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

102. Hester is neither disinterested nor independent. Any demand upon Defendant Hester is futile and, thus, excused.

**C. Demand Upon Defendant Caruso Is Excused**

103. Caruso authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

104. Caruso, as Chair of the Audit Committee, had duties regarding oversight of the risks facing the Company and Kyndryl's compliance with relevant laws, rules, and regulations. Caruso utterly failed to perform these essential duties.

105. Caruso, as a director of Kyndryl, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Kyndryl's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's financial reporting and disclosure controls and procedures;

(2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

106. Caruso is neither disinterested nor independent. Any demand upon Defendant Caruso is futile and, thus, excused.

**D. Demand Upon Defendant Harris Is Excused**

107. Harris authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

108. Harris failed to uphold his additional obligations as a member of the Nominating and Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

109. Harris, as a director of Kyndryl, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Kyndryl's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's financial reporting and disclosure controls and procedures; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

110. Harris is neither disinterested nor independent. Any demand upon Defendant Harris futile and, thus, excused.

**E. Demand Upon Defendant Jackson Is Excused**

111. Jackson authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

112. Jackson, as a director of Kyndryl, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Kyndryl's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's financial reporting and disclosure controls and procedures; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

113. Jackson failed to uphold her additional obligations as a member of the Nominating and Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

114. Jackson is neither disinterested nor independent. Any demand upon Defendant Jackson is futile and, thus, excused.

**F. Demand Upon Defendant Kugel Is Excused**

115. Kugel authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. Kugel benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the Kyndryl Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

116. Kugel, as a member of the Compensation and Human Capital Committee, had the duty, among others, to oversee the Company's executive compensation programs and evaluate the performance of the Company's executive officers. Kugel utterly failed to perform these essential duties.

117. Kugel, as a director of Kyndryl, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Kyndryl's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's financial reporting and disclosure controls and procedures; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

118. Kugel is neither disinterested nor independent. Any demand upon Defendant Kugel is futile and, thus, excused.

**G. Demand Upon Defendant Machuel Is Excused**

119. Machuel authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. Machuel benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Kyndryl Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

120. Machuel, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Kyndryl's compliance with relevant laws, rules, and regulations. Machuel utterly failed to perform these essential duties.

121. Machuel, as a director of Kyndryl, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Kyndryl's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's financial reporting and disclosure controls and procedures;

(2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

122. Machuel is neither disinterested nor independent. Any demand upon Defendant Machuel is futile and, thus, excused.

**H. Demand Upon Defendant Merchant Is Excused**

123. Merchant authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. Merchant benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Kyndryl Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

124. Merchant, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Kyndryl's compliance with relevant laws, rules, and regulations. Merchant utterly failed to perform these essential duties.

125. Merchant, as a director of Kyndryl, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Kyndryl's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's financial reporting and disclosure controls and procedures; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

126. Merchant is neither disinterested nor independent. Any demand upon Defendant Merchant is futile and, thus, excused.

**I. Demand Upon Defendant Schreuder Is Excused**

127. Schreuder authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

128. Schreuder, as Chair of the Compensation and Human Capital Committee, had the duty, among others, to oversee the Company's executive compensation programs and evaluate the performance of the Company's executive officers. Schreuder utterly failed to perform these essential duties.

129. Schreuder, as a director of Kyndryl, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Kyndryl's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's financial reporting and disclosure controls and procedures; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

130. Schreuder is neither disinterested nor independent. Any demand upon Defendant Schreuder is futile and, thus, excused.

**J. Demand Upon Defendant Ungerleider Is Excused**

131. Ungerleider authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

132. Ungerleider, as a member of the Compensation and Human Capital Committee, had the duty, among others, to oversee the Company's executive compensation programs and evaluate the performance of the Company's executive officers. Ungerleider utterly failed to perform these essential duties.

133. Ungerleider, as a director of Kyndryl, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Kyndryl's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's financial reporting and disclosure controls and procedures; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

134. Ungerleider is neither disinterested nor independent. Any demand upon Defendant Ungerleider is futile and, thus, excused.

**K. Other Factors Demonstrating That Demand Upon The Individual Defendants Is Excused**

135. Kyndryl has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover the damages it has suffered and will continue to suffer thereby.

136. The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

137. Publicly traded companies, such as Kyndryl, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Kyndryl's damages.

138. Demand upon the Board is further excused because the Board was constituted through a process controlled by Kyndryl's former parent, IBM. When Kyndryl was separated from IBM in November 2021, every member of the initial Kyndryl Board of Directors — all ten founding directors — was approved by the IBM Board of Directors. IBM retained a 19.9% equity stake in Kyndryl at the time of the spin-off. Schroeter himself served in multiple senior executive positions at IBM from 1992 until 2020, including as IBM's Chief Financial Officer (2014-2017) and Senior Vice President of Global Markets (2018-2020). Kyndryl continues to operate under multiple material agreements with IBM, including a transition services agreement, a tax matters agreement, an employee matters agreement, a real estate matters agreement, and intellectual property and commercial arrangements, as disclosed in the Company's annual proxy statement. The Board's entanglement with IBM — whose imprimatur was required for each director's original appointment — further compromises the Board's ability to exercise disinterested business judgment in responding to a demand.

## VII. CLAIMS FOR RELIEF

### COUNT ONE
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

139. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

140. This Count is asserted on behalf of the Company against the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

141. At all relevant times, in connection with Kyndryl's repurchases of its shares, the Individual Defendants made, disseminated, or approved false and misleading statements about the

Company, omitting material information specified herein, which they knew or deliberately disregarded as false, misleading, or incomplete, intending to deceive, manipulate, or defraud. These false, misleading, or incomplete statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

142. At the same time that the price of the Company's common stock was inflated due to the false, misleading, or incomplete statements, Defendants caused the Company to repurchase eleven million shares of its stock at prices artificially inflated by those statements. They engaged in a scheme to defraud the Company by causing it to repurchase shares at inflated prices.

143. The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts or omitting material facts necessary to make the statements not misleading, given the circumstances; and/or (c) engaging in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with its purchases of Kyndryl common stock.

144. The Individual Defendants, directly and indirectly, used means or instrumentalities of interstate commerce and/or the U.S. mail, participating in a continuous course of conduct that operated as a fraud and deceit upon the Company. They made or disseminated various false and/or misleading statements of material facts and omitted material facts necessary to make their statements not misleading, acted with intentional or reckless disregard for the truth, and employed devices and artifices to defraud in connection with the Company's purchase of Kyndryl common stock, deceiving the Company regarding its performance and internal controls.

145. As directors and officers, the Individual Defendants were directly responsible for and are liable for all materially false, misleading, or incomplete statements made during the relevant times.

146. The Individual Defendants acted with scienter, either intending to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth herein were either known to Defendants or were so significant that they should have been aware of them.

147. As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages related to its repurchases of Kyndryl common stock during the time period alleged. Therefore, the Individual Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

148. Plaintiff brings this claim within two years of discovering the facts constituting the violation and within five years of the violation.

**COUNT TWO**
**Against the Individual Defendants for**
**Violations of Section 14(a) of the Exchange Act**

149. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

150. The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

151. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

152. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

153. The 2025 Proxy Statement was materially false and misleading because the Individual Defendants were required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Kyndryl's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's financial reporting and disclosure controls and procedures; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

154. The misleading information contained in the 2025 Proxy Statement was material to Kyndryl shareholders in determining whether to elect Defendants Kugel, Machuel, and Merchant to the Board and approve the executive compensation.

155. The material misstatements and omissions in the 2025 Proxy Statement damaged the Company.

156. Plaintiff, on behalf of Kyndryl, seeks relief for damages inflicted upon the Company based on the misleading 2025 Proxy Statement in connection with the improper election of Defendants Kugel, Machuel, and Merchant and the approval of executive compensation.

**COUNT THREE**
**Against the Individual Defendants for Breach of Fiduciary Duties**

157. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

158. The Individual Defendants owed and owe fiduciary duties to Kyndryl. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Kyndryl the highest obligation of good faith and loyalty in the administration of Kyndryl's affairs. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Kyndryl alleged herein.

159. The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

160. The Individual Defendants each violated their fiduciary duties to Kyndryl and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Kyndryl's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's financial reporting and disclosure controls and procedures; (2) effectively oversee

the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

161. The Individual Defendants further breached their fiduciary duties to Kyndryl by, *inter alia*, making or allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

162. By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Kyndryl's affairs.

163. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Kyndryl has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the pending Securities Class Action.

164. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT FOUR**
**Against The Individual Defendants for Contribution Under Section 21D of the Exchange Act**

165. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166. The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under the federal securities laws.

167. Kyndryl is named as a defendant in a related securities fraud class action lawsuit that alleges and asserts claims arising under the federal securities laws. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Kyndryl is found liable for violating the federal securities laws, the Company's liability

will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

168. As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Kyndryl's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

169. The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

170. The Individual Defendants have damaged the Company and are liable to the Company for contribution.

## COUNT FIVE

## Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

171. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

172. The Individual Defendants, by virtue of their positions with Kyndryl and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Kyndryl and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Kyndryl to engage in the illegal conduct and practices complained of herein.

173. Plaintiff, on behalf of Kyndryl, has no adequate remedy at law.

**COUNT SIX**
**Against the Individual Defendants**
**for Aiding and Abetting**

174. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

175. Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

176. In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

177. Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

178. Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

**COUNT SEVEN**
**Against the Insider Seller Defendant**
**for Insider Trading (Brophy)**

179. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

180. By virtue of his position as an officer of Kyndryl, the Insider Seller Defendant had access to confidential and material non-public information concerning the Company, including the true extent of the Company's internal control failures, the manipulation of the Company's adjusted free cash flow metric, the unreliability of the Company's financial statements for multiple reporting periods, and the ongoing investigation by the SEC's Division of Enforcement.

181. As set forth above, while in possession of material non-public information, the Insider Seller Defendant engaged in insider trading by selling shares of Kyndryl common stock at artificially inflated prices during the Class Period, thereby enriching himself at the expense of the Company and its stockholders.

182. By reason of the foregoing, the Insider Seller Defendant is liable to Kyndryl for damages sustained by the Company as a result of his insider trading, and is required to disgorge all profits realized from his unlawful insider trading during the Class Period.

## COUNT EIGHT
**Against All Individual Defendants for Waste of Corporate Assets**

183. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

184. Beginning on November 21, 2024, and continuing through February 9, 2026, the Individual Defendants caused Kyndryl to repurchase approximately 11 million shares of its own common stock at artificially inflated prices. The Individual Defendants authorized and executed these share repurchases at a time when they knew, or were reckless in not knowing, that Kyndryl's financial statements were materially misstated, that the Company's adjusted free cash flow metric — the primary justification cited for initiating the buyback program — was manipulated, and that the Company's internal controls contained material weaknesses for multiple reporting periods.

185. The Individual Defendants' decision to authorize and execute these share repurchases at inflated prices was not the product of a valid exercise of business judgment. The Individual Defendants had no reasonable basis to believe that the buyback price reflected the Company's true intrinsic value given their knowledge of the undisclosed internal control failures. As a result, the Company paid tens of millions of dollars more for its own shares than they were actually worth.

186. By reason of the foregoing, the Individual Defendants are liable to the Company for waste of corporate assets, and the Company is entitled to recover from the Individual Defendants the damages sustained as a result of their unlawful conduct, including the excess consideration paid in connection with the share repurchase program.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Kyndryl, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Kyndryl;

(c) Declaring that the Individual Defendants violated Sections 10(b), 14(a), 20(a), and 21D of the Exchange Act;

(d) Determining and awarding to Kyndryl the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(e) Directing Kyndryl to take all necessary action to reform and improve its compliance, internal control systems and corporate governance practices and procedures to protect the Company and its stockholders from a repeat of the damaging events described herein;

(f) Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(g) Requiring the Insider Seller Defendant to disgorge all profits obtained from his insider trading;

(h) Awarding to the Company restitution from Defendants, and each of them;

(i) Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(j) Granting such other and further relief as the Court deems just and proper.

## IX. JURY DEMAND

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: March 6, 2026

**WEISS LAW**

By: <u>*/s/ David C. Katz*</u>
David C. Katz
Mark Smilow
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
msmilow@weisslawllp.com

Joshua M. Rubin
4 Brighton Rd., Ste. 204
Clifton, NJ 07014
Email: jrubin@weisslawllp.com

*Attorneys for Plaintiff*

**VERIFICATION**

I, Nechama Gross, hereby verify that I have held stock in Kyndryl Holdings, Inc. ("Kyndryl" or the "Company") since at least November 3, 2021. As such, I was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint"). I am ready, willing, and able to pursue this stockholder derivative action on behalf of the Company. I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing Complaint, and having reviewed it with my counsel, I hereby authorize its filing.

Dated: March 6, 2026

Nechama Gross